# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

### No. ACM 39715

---

### UNITED STATES
*Appellee*

v.

### Marshall B. KER
Senior Airman (E-4), U.S. Air Force, *Appellant*

---

Appeal from the United States Air Force Trial Judiciary

Decided 15 December 2020

---

*Military Judge:* Shaun S. Speranza (arraignment); Bryon T. Gleisner.

*Approved sentence:* Dishonorable discharge, confinement for 17 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 25 April 2019 by GCM convened at the Eglin Air Force Base, Florida.

*For Appellant:* Lieutenant Colonel Garrett M. Condon, USAF; Robert Feldmeier, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire; Alexis Dorner (legal extern).[1]

Before LEWIS, RAMÍREZ, and D. JOHNSON, *Appellate Military Judges.*

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge LEWIS and Judge D. JOHNSON joined.

---

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

[1] Ms. Dorner was at all times supervised by an attorney admitted to practice before this court.

_____

RAMÍREZ, Judge:

A general court-martial composed of a military judge sitting alone found Appellant guilty, pursuant to his pleas and a pretrial agreement (PTA), of one charge and two specifications of attempted sexual assault of a child and attempted sexual abuse of a child, all in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[2] While Appellant was charged with two additional specifications, also under Article 80, UCMJ, the convening authority agreed to withdraw and dismiss both with prejudice as a term of the PTA.

The military judge sentenced Appellant to a dishonorable discharge, confinement for 17 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged, and the PTA had no impact on the convening authority's ability to approve the adjudged sentence.[3]

On appeal, Appellant raises three assignments of error: (1) whether Appellant's plea as to Specification 4 of the Charge was improvident based on the *Care* inquiry;[4] (2) whether Appellant's trial defense counsel were ineffective in presentencing; and (3) whether Appellant's plea was improvident based on an alleged lack of mental responsibility or, in the alternative, because his diminished mental state made him susceptible to undue pressure from his defense counsel.[5] Finding no error materially prejudicial to Appellant, we affirm the findings and sentence.

## I. BACKGROUND

The Internet Crimes Against Children (ICAC) Task Force is made up of federal, state, and local law enforcement and prosecutorial agencies. The purpose of the Task Force is to engage in proactive and reactive investigations and prosecutions of persons involved in child abuse and exploitation using the Internet. Law enforcement agents involved in ICAC operations are trained in

_____

[2] All references to the Uniform Code of Military Justice and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] The PTA provided that the convening authority would approve no confinement in excess of 18 months.

[4] *See United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

[5] This issue was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

conducting undercover Internet child exploitation operations, developing an undercover child persona, engaging with subjects on the Internet, avoiding entrapment of subjects, and preserving electronic evidence.

In early January 2018, the Air Force Office of Special Investigations (AFOSI) at Eglin Air Force Base (AFB), Florida, was working an ICAC operation. AFOSI Special Agent MB was assigned to the operation and went undercover. His online persona was a 14-year-old girl named "Molly Turner." Agent MB created and posted an advertisement on the "Casual Encounters" subsection of the Internet website "Craigslist."[6] The posting stated: "Our little secret - w4m (Eglin) . . . New to area and lookin for someone to show me around . . . I live on base so must be able to get on . . . send a pic in reply Discreet a must."

On 5 January 2018, Appellant, 26 years old at the time, responded by email through the Craigslist posting with two photographs and a statement that he worked on Eglin AFB. Within the first four email messages between "Molly" and Appellant, "Molly" notified him that she was a child by stating that she "live[s] on base w my mom" and "well I wann b real w u first I'm a red head and 14 almost 15 yo. Just wann b real first." The next day, Appellant acknowledged that "Molly" was a child by asking what she was looking for and why she posted online at her age. "Molly" responded that she was just "lookin 4 fun. Boys my age r immature." On this same day Appellant and "Molly" moved their conversations from the email feature of Craigslist to the "Kik" messaging application.[7]

Later that same day, Appellant turned the conversation to sex. Appellant told "Molly," "I like public play if I'm safe of getting caught, I like to give anal and oral, I like kissing and foreplay, learning new positions, etc." He explained to her that "public play" is "[l]ike a fitting room, or movie theater, a park, etc," and inquired "[d]oes any of that sound interesting to you?"

The next day, 7 January 2018, Appellant suggested the idea of a threesome between himself, "Molly," and a 14-year old friend of hers. He also talked to her about anal sex and the importance of using sexual lubricant. Later that same day, Appellant began to make arrangements to meet "Molly" in person and asked her if she wanted to have "some car fun." With that, "Molly" asked

---

[6] Quotes from "Craigslist" and text messages between Appellant and "Molly Turner" appear in their original form, without correction.

[7] Kik is a cross-platform instant messenger application that allows users who register a username to send messages and share files. It is available free of charge and uses a smartphone's data plan or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content.

if Appellant would bring anything with him and he responded with the suggestion of taking "lube" with him.

On 8 January 2018, Appellant formalized his plan to meet "Molly" in person the next day after she returned home from school. They arranged to meet at a parking lot on Eglin AFB. True to the plan, the next day, Appellant travelled to the arranged meeting location in his personal vehicle, where he was intercepted and apprehended. After a search of Appellant's car, law enforcement officers found two unopened condoms and a sealed pump bottle of lubricant labeled "uberlube" wrapped inside toilet paper.

After the charge and specifications were referred to trial, Appellant, with the assistance of counsel, negotiated a PTA and entered into a stipulation of fact. Appellant stipulated that his arrival at a predesignated location to meet "Molly" with lubricant and condoms was accomplished in order to commit a sexual act upon a child, "Molly," by causing penetration, however slight, of her anus with his penis. Appellant also stipulated that his arrival at a predesignated location to meet "Molly" amounted to more than mere preparation, and was a substantial step and a direct movement toward the commission of the intended offense.

## II. DISCUSSION

### A. Providence of Guilty Plea

Appellant alleges that the military judge abused his discretion by finding that Appellant's guilty plea was providently entered as to Specification 4 of the Charge because his *Care* inquiry revealed only mere preparation to commit sexual assault. We first note that Appellant means Specification 2, not 4. Appellant refers to the conduct in Specification 2 when he claims that his pleas were improvident and argues that he only described acts constituting mere preparation and that travel to a rendezvous location is mere preparation when significant steps remain in order for an Appellant to be guilty. Specification 2 alleged that Appellant attempted to commit a sexual act upon "Molly," a person whom he believed to be a child who had attained the age of 12 years but not 16 years, to wit: penetrating "Molly's" anus with his penis. On the other hand, Specification 4 alleged that Appellant communicated indecent language. Appellant does not argue anything in his assignments of error related to communicating indecent language. As explained below, we disagree that Appellant's plea to Specification 2 was improvident.

#### 1. Law

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Blouin*, 74 M.J. 247, 251 (C.A.A.F. 2015) (citation omitted). "A military judge abuses his discretion if he fails to obtain from the

accused an adequate factual basis to support the plea—an area in which we afford significant deference." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) (citation omitted).

"The test for an abuse of discretion in accepting the guilty plea is whether the record shows a substantial basis in law or fact for questioning the plea." *United States v. Moon*, 73 M.J. 382, 386 (C.A.A.F. 2014) (citation omitted). An appellant bears the "burden to demonstrate a substantial basis in law and fact for questioning the plea." *United States v. Finch*, 73 M.J. 144, 148 (C.A.A.F. 2014) (quoting *United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004)).

"[W]here a guilty plea is first attacked on appeal, we must construe the evidence in a light most favorable to the Government." *United States v. Hubbard*, 28 M.J. 203, 209 (C.M.A. 1989) (Cox, J., concurring).

Rule for Courts-Martial (R.C.M.) 910(e) explains that the "military judge shall not accept a plea of guilty without making such inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea." "Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F. 1996) (citation omitted). When entering a guilty plea, the accused should understand the law in relation to the facts. *United States v. Care*, 40 C.M.R. 247, 251 (C.M.A. 1969).

The record of trial must show that the military trial judge questioned the accused about what he did or did not do, and what he intended. *Id.* at 253. This is to make clear to the military judge whether the accused's acts or omissions constitute the offense to which he is pleading guilty. *Id.* "If an accused sets up matter inconsistent with the plea at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014) (internal quotation marks and citation omitted).

"This court must find a substantial conflict between the plea and the accused's statements or other evidence in order to set aside a guilty plea. The mere possibility of a conflict is not sufficient." *Id.* (internal quotation marks and citation omitted). "The Court applies this 'substantial basis' test by determining whether the record raises a substantial question about the factual basis of appellant's guilty plea or the law underpinning the plea." *United States v. Hobbs*, ARMY 20100791, 2011 CCA LEXIS 138, at *3 (A. Ct. Crim. App. 29 Jul. 2011) (unpub. op.) (citing *Inabinette*, 66 M.J. at 322).

In reviewing the providence of an appellant's guilty pleas, "we consider his colloquy with the military judge, as well any inferences that may reasonably be drawn from it." *United States v. Timsuren*, 72 M.J. 823, 828 (A.F. Ct. Crim. App. 2013) (quoting *United States v. Carr*, 65 M.J. 39, 41 (C.A.A.F. 2007)).

Article 80, UCMJ, defines an attempt as "[a]n act, done with specific intent, to commit an offense . . . amounting to more than mere preparation and tending, even though failing, to effect its commission." *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.a.(a). To constitute more than "mere preparation," the act must be a "substantial step" towards commission of the offense. *See United States v. Schoof*, 37 M.J. 96, 102 (C.M.A. 1993) (citations omitted). A "substantial step" must be conduct "strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Hale*, 78 M.J. 268, 272 (C.A.A.F. 2019) (citing *United States v. Byrd*, 24 M.J. 286, 290 (C.M.A. 1987)). An attempt is more than "devising or arranging the means or measures necessary for the commission of the offense;" rather, it is a "direct movement toward the commission after the preparations are made." *Id.* at 271 (quoting *Schoof*, 37 M.J. at 103). However, "[t]he overt act need not be the last act essential to the consummations of the offense." *Id.* (citation omitted).

The elements of the underlying offense of sexual assault of a child in this case required proof beyond a reasonable doubt that: (1) Appellant committed a sexual act upon a child by causing penetration of her anus with his penis; and (2) at the time of the sexual act, the child had attained the age of 12 years but had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(3)(a).

In cases involving attempted sexual exploitations of a minor arranged through the Internet, what must be analyzed is "the online dialogue." *United States v. Winckelmann*, 70 M.J. 403, 408 (C.A.A.F. 2011) (citations omitted). This is "to distinguish hot air and nebulous comments from more concrete conversation that might include making arrangements for meeting the supposed minor, agreeing on a time and place for a meeting, making a hotel reservation, purchasing a gift, or traveling to a rendezvous point." *Id.* (alterations, internal quotation marks, and citations omitted).

The United States Court of Appeals for the Armed Forces (CAAF) has "recognized that a substantial step could be comprised of something as benign as travel, arranging a meeting, or making hotel reservations." *Hale*, 78 M.J. at 272 (footnote and citation omitted).

**2. Analysis**

Appellant argues that his plea of guilty was improvident. He claims that based on the *Care* inquiry, his actions only constituted mere preparation. Appellant alleges that by accepting his guilty plea, the military judge abused his discretion.

Appellant bases his argument on the contention that by driving to the parking lot, he simply prepared to meet "Molly" and had not yet completed a substantial step. Appellant argues that he would have had to travel to another location to complete the "substantial step" requirement because according to

him, it "is clear that the proposed sexual transaction would not occur in a parking lot, in public, during apparent daylight, in the full view of others." However, text messages between Appellant and "Molly" in the Stipulation of Fact indicate otherwise, as does the *Care* inquiry.

When Appellant and "Molly" were exchanging messages about trying anal intercourse and deciding an appropriate meeting place, Appellant wrote, "Lol so you'd want some car fun?" To which Molly responded, "Sure if u want lol kinda good I'm excited . . . ." Molly then sent another message immediately thereafter presumably correcting her last message by writing, "Sounds good . . . ."

It is clear from this exchange that Appellant expected to engage in anal intercourse, with Molly, in his car, in the parking lot. This is evident when coupled with what Appellant said under oath, on the record, during the *Care* inquiry. In his own words, Appellant explained:

> Eventually we talked about anal intercourse, and Molly seemed to me to be open and willing to try it. We planned to meet in person, and when she asked me if I would bring any lubrication, I agreed. I got off work on the 9th of January 2018, and I drove my car from where I worked to meet Molly in the parking lot near the Bayview Club, which is on Eglin [AFB]. I had condoms and lubricant with me in the car. I had them with me because I believed that I was meeting up with Molly Turner[ ] and I believed that we were going to have anal intercourse. And by that, Your Honor, I admit to you that I believed I was going to penetrate her anus with my penis.

When the military judge asked Appellant what acts he took in meeting "Molly," Appellant explained that they agreed on a place to meet, that he "gathered" the condoms and the lubricant, and placed them in his car in the morning before he went to work. He explained that after work, he drove to the meeting area, parked, and waited for her. The military judge clarified this by asking Appellant if he intended to engage in sexual acts with "Molly" when he put the condoms and lubricant in his vehicle and drove to the club. Appellant stated that he did. Appellant also stated that he would have committed the offense of sexual assault of a child if "Molly" had been a real person of the age of 14. Further, Appellant agreed that his acts went beyond mere preparation and were a substantial step in a direct movement toward the commission of the offense of sexual assault of a child.

The military judge satisfied his obligations by explaining the elements of the specification and questioning Appellant about what he intended to do with "Molly." The specification addressed Appellant's attempted sexual assault of a

child. Appellant stated that he understood the elements of the offense, agreed that his acts had satisfied all the elements, and described his relationship with "Molly" from its inception to its conclusion.

As to the issue of "more than mere preparation and taking a substantial step towards the commission of the offense," this too is satisfied. As discussed, Appellant drove to the parking lot to meet Molly and engage in anal intercourse with her in his car. Additionally, Appellant had condoms and a lubricant in his car to facilitate the anal intercourse. Appellant completed the preparation for this offense once he and Molly agreed on a time, date, and location to meet. It is indicative of his intent to engage in the sexual act upon his arrival at the location, and therefore reinforces that his travel to the location was a substantial step. Driving to the agreed-upon location at the agreed-upon time on the agreed-upon date was the direct movement toward the commission as contemplated by *Hale*. *See* 78 M.J. at 272 (citation omitted).

Finally, we conclude that Appellant did not set up matter inconsistent with the plea which would have required the military judge to either resolve the apparent inconsistency or reject the plea. Therefore, we find that the military judge did not abuse his discretion when finding Appellant's plea to be provident.

## B. Ineffective Assistance of Counsel

In a post-trial declaration submitted to this court, Appellant alleges that trial defense counsel were ineffective in pre-sentencing, claiming they did not seek to admit Appellant's desired evidence and had no valid reason for failing to do so. Appellant's claim can be broken up into three arguments, claiming his counsel failed to: (1) submit letters of support, (2) introduce medical evidence, and (3) call certain witnesses. After considering the declarations submitted,[8] we find that trial defense counsel had a reasonable explanation for not submitting the documents, calling witnesses, or introducing medical evidence.

### 1. Additional Background

Appellant states in his declaration that he directed his detailed trial defense counsel to submit what he claims were significant mitigation matters for his presentencing case. Specifically, Appellant states that he directed trial defense counsel to submit letters of support from friends and family, and provided

---

[8] We considered Appellant's and trial defense counsel's declarations to resolve the raised issues. *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020) (holding Courts of Criminal Appeals may consider affidavits when doing so is necessary for resolving issues raised by materials in the record); *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991).

the letters of support to his counsel as well as the names and contact information of his family members, friends, and co-workers who could testify or provide additional character letters. Appellant's declaration alleges that his counsel did not contact the witnesses or offer any of the character letters.

Next, Appellant states that he provided his counsel with his medical records. He claims these records indicated he was suffering from multiple psychiatric and neurological conditions during the charged timeframe. Aside from medical records, Appellant asserts that he provided his counsel with information regarding social pressures that affected his mental state at the time of his charged offenses. Appellant claims that his counsel did not bring any of these matters to the attention of the court-martial despite Appellant's view that they were significant and readily available.

Finally, Appellant states that both of his grandparents were present in the courtroom for presentencing proceedings and that they could have been called as witnesses, given that they raised him. Trial defense counsel did not call either grandparent to testify.

Appellant was represented by two trial defense counsel at his court-martial, Captain (Capt) KR and Capt KS. Both provided responsive declarations, which we consider in resolving Appellant's claims.

Capt KR explained that as part of their sentencing preparation, the Defense interviewed numerous individuals whom Appellant listed as potential witnesses. Those witnesses included Appellant's roommate, supervisors, current and former co-workers, his wife, the psychologist who conducted the R.C.M. 706[9] inquiry, and his grandparents.

According to Capt KR, each of the interviews revealed some negative facts that would have been disadvantageous if revealed during the presentencing hearing. Capt KR provided the following example: Appellant dating a woman shortly after arriving at Eglin AFB, while Appellant's wife remained in Little Rock, Arkansas. Given the charged offenses, Capt KR felt that listing this witness would risk that the Prosecution would find out about this relationship, which would be detrimental to their case. As to Appellant's wife, Capt KR indicated that Appellant was receiving the with-dependent rate of Basic Allowance for Housing while separated, but Appellant did not provide his wife any significant financial support, and trial defense counsel did not want to draw attention to this fact by highlighting Appellant's living situation.

---

[9] Rule for Courts-Martial 706 permits inquiry into the mental capacity or mental responsibility of the accused if there is reason to believe that the accused lacked mental responsibility for any offense charged or lacks capacity to stand trial.

The Defense also interviewed Appellant's supervisors and co-workers who believed he was between average and "lazy." Capt KR acknowledged that one of Appellant's prior co-workers from Little Rock AFB, Arkansas, recounted a positive incident where Appellant selflessly helped a stranded motorist change a tire at nighttime in the rain. However, once counsel informed the potential witness of the charges and that his testimony would be used for sentencing purposes, the co-worker became hesitant and made it clear that he did not want to provide a "character reference." Capt KR explained that this was a recurring theme, as even individuals that had positive things to say about Appellant would immediately distance themselves and become uncooperative once they learned about the charges.

Capt KR indicated that the Defense did interview Appellant's grandparents. However, it became evident to trial defense counsel that Appellant's grandparents were not aware of what was going on in Appellant's life. Capt KR and Capt KS discussed the pros and cons of their testimony and decided that having either one of the grandparents testify would make Appellant look secretive and deceptive on cross-examination, as it was clear that he was intentionally withholding information from the people that loved him dearly. According to Capt KR, it seemed that the grandparents' opinion of Appellant was based upon an unrealistic picture of their grandson.[10]

Capt KR explained that due to Appellant's medical history, the Defense requested a sanity board pursuant to R.C.M. 706. The medical history reviewed by the Defense included an off-base neuropsychological report from June 2018 that evaluated Appellant for: (1) a September 2017 incident when Appellant hit his head while underneath an aircraft; and (2) a March 2018 car accident in which Appellant was rear-ended. After the R.C.M. 706 inquiry was ordered and completed, Capt KS interviewed the psychologist who conducted the examination and both counsel discussed, at length, the pros and cons of introducing the R.C.M. 706 report. Trial defense counsel concluded that introducing the report as evidence, or calling the psychologist as a witness, would have resulted in the Government receiving the complete version of the report, which was concerning from a defense perspective because it could have used to paint a picture of Appellant as an individual who tried to exploit his medical issues in order to lessen his culpability. The Defense decided that this was not beneficial at a presentencing hearing where one of their most powerful arguments was that Appellant took responsibility for his actions by pleading guilty.

---

[10] Appellant's paternal grandmother submitted a letter on his behalf during the clemency portion of the case. We infer her testimony at Appellant's sentencing hearing would have been similar to her letter.

The Defense also considered introducing documentary evidence in the form of character letters. However, this would have required the Defense to ask that the rules regarding hearsay, foundation, and authentication be relaxed pursuant to R.C.M. 1001(d)(3). This was concerning to trial defense counsel due to the plethora of evidence that would have been available to the Prosecution as a result of relaxing the rules. Capt KR believed the evidence would have been disadvantageous.

Capt KS's declaration provides similar points to Capt KR's. Capt KS explained that after evaluating all of the facts and evidence, the defense strategy centered on attempting to minimize Appellant's potential period of confinement. According to Capt KS, Appellant agreed to plead guilty to a mandatory dishonorable discharge offense, so limiting confinement was Appellant's priority. Capt KS explained that the defense team sought to portray Appellant as an Airman who understood his mistakes and was prepared to take responsibility for them. For this reason, trial defense counsel strategically chose not to elicit any evidence beyond Appellant's unsworn statement. Trial defense counsel tailored the information considered by the military judge to avoid opening doors to unfavorable evidence they knew existed and which the Government could admit through impeachment and rebuttal. Specifically, Capt KS noted that she had successfully advocated for Appellant's commander not to prefer an additional charge related to alleged fraud of basic allowance for housing and failure to provide support to his wife.

Capt KS also addressed the categories of evidence Appellant raises on appeal. She explained that like all of their "tactical decisions," both trial defense counsel discussed their thought process regarding presentencing evidence with Appellant. Trial defense counsel's articulated strategy was to limit the Defense's evidence to Appellant's verbal unsworn statement before the court, his written unsworn statement, and photographs. Going one step further, trial defense counsel explained their concerns to Appellant regarding the evidence and what doors could be opened by introducing evidence that at first glance looked beneficial but could have very negative effects. During those discussions, trial defense counsel also made it clear to Appellant that he was free to release them as his counsel if he did not agree with their strategy. Appellant signed a written memo the day before he pleaded guilty and was sentenced that stated he understood and agreed with the defense strategy. Capt KS emphasized that despite Appellant's assertion to the contrary in his declaration, Appellant did not indicate at any point that he desired to submit character letters, call witnesses, or introduce medical evidence, nor did he express disagreement with their trial defense strategy or their representation.

**2. Law**

We review claims of ineffective assistance of counsel de novo. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (citation omitted). Appellate courts give great deference to trial defense counsel's judgments and presume "counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Morgan*, 37 M.J. 407, 409 (C.M.A. 1993) (citations omitted). Ineffective assistance of counsel claims are analyzed under the test set out by the United States Supreme Court: "(1) whether counsel's performance fell below an objective standard of reasonableness; and (2) if so, whether, but for the deficiency, the result would have been different." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). An appellant has the burden to demonstrate "both deficient performance and prejudice." *Id*. (citation omitted).

Courts begin this analysis "presum[ing] that the lawyer is competent" with "the burden rest[ing] on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984) (footnote and citation omitted).

The CAAF recast the *Strickland* standard by asking:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *Akbar*, 74 M.J. at 379 (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

In determining whether to grant a post-trial hearing to resolve a factual matter pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967), we are guided by the standard enunciated in *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). Courts of Criminal Appeals do not "decide disputed questions of fact pertaining to a post-trial claim, solely or in part on the basis of conflicting affidavits submitted by the parties." *Ginn*, 47 M.J. at 243. However, we may resolve competing claims when a post-trial claim is "conclusively refuted as to the alleged facts by the files and records of the case" and "state conclusions instead of facts, contradict the record, or are 'inherently incredible.'" *Id.* at 244 (quoting *United States v. McGill*, 11 F.3d 223, 226 (1st Cir. 1993)).

### 3. Analysis

As an initial matter, we note Appellant's general objections to the declarations of his counsel as referenced in his reply brief.[11] Specifically, we are not persuaded by Appellant "generally object[ing] to both declarations, to the extent the responses exceed the [c]ourt's order, specifically for releasing confidential as well as secret information known by defense counsel relating to the representation that was unnecessary to rebut the claims of ineffective assistance of counsel." Additionally, we are not persuaded by Appellant "generally object[ing] to both declarations, to the extent the responses exceed the [c]ourt's order, specifically for releasing information privileged under [Mil. R. Evid.] 302." After reviewing trial defense counsel's declarations, we find they were sufficiently detailed and necessary to address each issue raised by Appellant.

As to the disputed questions of fact on the basis of conflicting affidavits submitted by the parties, we have considered whether to order a *DuBay* hearing by relying on *Ginn*. We find that we may resolve these competing claims without such a hearing, as Appellant's position is conclusively refuted by the files and records of the case attached to the appellate record.[12]

As to the appellate issues, Appellant and his trial defense counsel agree that certain witnesses and certain evidence were not admitted. As such, we begin our analysis with the first question of the *Gooch* standard: *Is there a reasonable explanation for counsel's actions?*

---

[11] Appellant did not submit a response to the Government's motion to attach the declarations.

[12] Specifically, there is a memo executed by Appellant entitled, "my decisions about character evidece [sic] and the defense case."

We find there is a reasonable explanation and that each explanation is based on tactical decisions made as objectively reasonable choices in strategy from the available alternatives. Here we do not resort to distorting effects of hindsight or reconstruct the circumstances of counsel's challenged conduct, but instead we evaluate the conduct from counsel's perspective at the time that advice was given or decisions were made.

As to the issue of not calling witnesses such as Appellant's roommate, co-workers, wife, and grandparents, the reasonable explanation is that these witnesses may have provided damaging testimony that portrayed Appellant in a significantly unfavorable light. This was a sufficient basis not to call them as sentencing witnesses.

With regards to not securing letters of support from others, the reasonable explanation is that a recurring theme developed for trial defense counsel—as individuals that had positive things to say about Appellant, they would immediately distance themselves and become uncooperative once they learned about the charges. Additionally, to get this evidence admitted, trial defense counsel would have been required to request the relaxation of the evidentiary rules during the sentencing phase, pursuant to R.C.M. 1001(c)(3). This would have opened the door for the Government to attack the proffered evidence, as R.C.M. 1001(d) allows the Military Rules of Evidence to be relaxed for the Government once they have been relaxed for the Defense.

As to the mental health issues, the reasonable explanation is that the evidence could have shown that Appellant used his ailments and injuries as excuses for his actions; they could show that neither Appellant's mental or physical diagnoses would account for the behavior that led to the charged offenses; and the complete R.C.M. 706 report might paint a picture of Appellant as an individual who tried to exploit his medical issues to lessen his culpability. Again, this was a sufficient basis to not admit evidence of Appellant's physical injuries and mental health issues.

It is clear that trial defense counsel discussed the pros and cons of each issue raised on appeal by Appellant amongst themselves and with Appellant, and ultimately decided that it was not beneficial at a presentencing hearing where one of their most powerful arguments was that Appellant took responsibility for his actions by pleading guilty.

Trial defense counsel's articulated strategy was to limit the Defense's evidence to Appellant's statement before the court, his written statement, and photographs, and thereby limit the Government's evidence in rebuttal. This was certainly reasonable based on the *Gooch* standard. Therefore, based on the matters that trial defense counsel agree with Appellant were not done, this court does not find that Appellant has met his burden. We affirmatively find

that trial defense counsel were not ineffective in their representation of Appellant.

## C. Providence of Guilty Plea

As a *Grostefon* issue, Appellant personally alleges that his pleas were improvident because he was not mentally competent at the time of his offenses. He then states that this court should order the production of the medical records which are the focus of the second assignment of error to prove his point. Alternatively, Appellant asserts that his injuries and medication regimen made him susceptible to the undue influence of his trial defense counsel and that he would not have pleaded guilty but for the undue influence of his defense team. We do not agree with Appellant as to either matter.

### 1. Law

With regard to the providence of his guilty pleas, we rely on the law as articulated in our discussion of Appellant's first assignment of error. Additionally, as it applies to Appellant's request to order the entirety of his R.C.M. 706 long report, it is an issue of a post-trial dispute over discovery relevant to an appeal.

"When faced with a post-trial dispute over discovery relevant to an appeal, an appellate court . . . must determine whether the appellant met his threshold burden of demonstrating that some measure of appellate inquiry is warranted." *United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002) (citation omitted). Among other things, this court should consider:

> (1) whether the [appellant] has made a colorable showing that the evidence or information exists;
>
> (2) whether or not the evidence or information sought was previously discoverable with due diligence;
>
> (3) whether the putative information is relevant to appellant's asserted claim or defense; and
>
> (4) whether there is a reasonable probability that the result of the proceeding would have been different if the putative information had been disclosed.

*Id.*

### 2. Analysis

We begin by declining Appellant's invitation to order the production of the full, complete R.C.M. 706 report. Based on the record before us, Appellant has not demonstrated relevance for the production of this document. Additionally, the information provided by trial defense counsel as it relates to the full, complete R.C.M. 706 report makes it clear that there is no reasonable probability

that the result of the proceeding would have been different if the putative information had been disclosed.

Everything that is in the record points directly to Appellant knowing what he did at the time of his criminal offenses and at the time of his guilty plea. He was unambiguous, on the record, that he could have avoided committing his criminal offenses if he had wanted to.

Additionally, there is nothing before us to suggest that trial defense counsel unduly influenced him to plead guilty. Appellant clearly told the military judge, under oath, that he had enough time to discuss his plea of guilty with his trial defense counsel; that he was satisfied with his trial defense counsel's advice concerning his plea of guilty; and that he was pleading guilty not only because he hoped to receive a lighter sentence, but also because he was convinced that he was, in fact, guilty. Additionally, Appellant told the military judge that he was pleading guilty voluntarily and of his own free will and that no one made any threats or tried in any way to force him to plead guilty.

In his own words on the attempted sexual assault of a child offense, Appellant told the military judge:

> I do take total responsibility for all of my actions. No one forced me to do the things that I did, and I could have stopped talking to her at any point. I could have also never driven to meet her. I did everything described of my own free will, and I realized that if Molly was actually a person who I believed that she was, I would have committed a sexual assault of a child. Your Honor, I do know how wrong—wrong doesn't even begin to describe it. I do know how wrong this was, and I'm very sorry about it.

Based on the record before us, we find that Appellant's pleas were provident, Appellant was not mentally incompetent at the time of his offenses, and that there was no undue influence by his trial defense counsel.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court